# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 18-1486V
UNPUBLISHED

| | |
|---|---|
| HOPE JOHNSON,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: January 25, 2021<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Shoulder Injury Related to<br>Vaccine Administration (SIRVA) |

*Ronald Craig Homer*, Conway, Homer, P.C., Boston, MA, for Petitioner.

*Camille Michelle Collett*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING DAMAGES[1]

On September 26, 2018, Hope Johnson filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a shoulder injury related to vaccine administration ("SIRVA"), a defined Table Injury, after receiving the influenza ("flu") vaccine on October 10, 2015. Petition at 1, ¶¶ 1-3. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount **$67,422.95, representing $65,000.00 for her past pain and**

---

[1] Because this Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

**suffering, $693.81 for her past lost wages, and $1,729.14 for her unreimbursed out-of-pocket expenses.**

## I. Relevant Procedural History

The Petition was filed in 2018 without medical records, shortly before the expiration of the Vaccine Act's statute of limitations. Petition, ECF No.1; *see* Section 16(a)(2). Over the subsequent six-month period, from late September 2018 through late March 2019, Petitioner filed an amended petition and the affidavit and medical records required to support her claim. Amended Petition, ECF No. 21; Exhibits 1-15, ECF Nos. 9-10, 14, 17, 19; Exhibit List, ECF No. 20.

On September 9, 2019, Respondent indicated he had completed his review of the claim and wished to engage in settlement discussions. ECF No. 26. Over the subsequent ten-month period, the parties exchanged multiple offers and counteroffers but were unable to informally resolve the case. *E.g.,* Status Report, ECF No. 36. During a call held on July 28, 2020, the parties agreed that I might be required to determine the appropriate amount of compensation, since they could not independently agree on an amount. ECF No. 38. Respondent estimated he could file his Rule 4 Report conceding entitlement within 60 days, and the parties acknowledged they could concurrently finalize their briefs regarding the appropriate amount of damages. *Id.*

Respondent filed his Rule 4 Report on September 28, 2020, and I issued a Ruling on Entitlement a few days thereafter. ECF Nos. 39-40. On October 16, 2020, Petitioner filed his damages brief. Petitioner's Memorandum in Support of Damages ("Pet. Brief"), ECF 42. After requesting additional time, Respondent filed his damages brief on December 17, 2020. Respondent's Brief on Damages ("Res. Brief"), ECF No. 45.

The issue is now ripe for adjudication.

## II. Medical History

The medical records show that prior to vaccination, Petitioner suffered from chronic back pain for approximately 15 years. *E.g.* Exhibit 2 at 32-33. She routinely sought chiropractic care for this condition both before and after vaccination. *See* Exhibit 10. Petitioner received the flu vaccine on October 10, 2015. Exhibit 1.

Two days after vaccination, Petitioner sought treatment for her left shoulder pain from her primary care provider ("PCP"). Although her level of pain was not noted, she described it as occurring immediately and worsening over several hours. Exhibit 2 at 26.

She was prescribed Prednisone[3] and instructed to start physical therapy ("PT") in two weeks if her pain persisted. *Id.*

At her initial PT session on October 26, 2015, Petitioner rated her level of pain as seven to eight out of ten. Exhibit 9 at 4. She was observed to have normal strength and only mild limitation in her range of motion ("ROM"), ranging from zero to ten degrees. *Id.* By her second session on October 30, 2015, Petitioner's level of pain had decreased to four out of ten. *Id.* at 10. Four days later, Petitioner described her pain as intermittent while indicating that her shoulder felt "like it has loosened up a bit." *Id.* at 9. In early November, Petitioner reported that her "[l]eft shoulder [was] about 40% better overall." *Id.* at 7. She indicated that "[s]ome days the shoulder doesn't hurt at all" (*id.*), adding that she had "[m]ore pain free days that [sic] painful days" (*id.* at 8).

It appears Petitioner experienced a slight setback between her fourth and fifth PT sessions. By her fifth visit (on November 10, 2015), Petitioner's pain had increased to five out of ten, but she reported that it was "getting better today." *Id.* at 6. At her last PT session on November 12, 2015, Petitioner reported less pain overall but noted that "some days it really hurts." *Id.* at 5. She continued to have difficulty sleeping and exhibited the same mild limitation in her ROM. *Id.* The physical therapist recommended that PT be suspended for 30 days so Petitioner could "return to her doctor for further evaluation of the shoulder." *Id.* at 6.

When Petitioner visited her PCP again on November 16, 2015, she reported that her pain had improved but was now worsening. Exhibit 2 at 24. She indicated that Prednisone "got rid of [her] pain," but that it returned two days after her last dose. *Id.* Ibuprofen and heat helped temporarily. *Id.* Petitioner was observed to have full ROM, with discomfort with some movement. *Id.* at 25. Her PCP prescribed Tramadol[4] and a Prednisone taper and instructed her to continue heat therapy. *Id.* at 24.

Petitioner was seen again by her PCP for chronic back pain on December 8, 2015. During the visit, she reported that her shoulder pain, which she described as intermittent, was "better but not fully gone." Exhibit 2 at 22. She rated the level of her pain as two out of ten. *Id.*

On February 22, 2016, Petitioner returned to her PCP, complaining of deep, acing pain in her left shoulder since receiving the flu vaccine in October, but the level of her pain was not quantified. Exhibit 2 at 20. She acknowledged some relief from the first

---

[3] Prednisone is "a synthetic glucocorticoid derived from cortisol, administered orally . . . for a wide variety of conditions." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ("DORLAND'S") at 1508 (32th ed. 2012).

[4] Tramadol hydrochloride is "an opioid analgesic used for the treatment of moderate to moderately severe pain following surgical procedures and oral surgery; administered orally." DORLAND'S AT 1950.

course of Prednisone but reported no relief from PT or chiropractic care. *Id.* It is important to note, however, that there is no evidence in the medical records from Petitioner's chiropractor that he treated her left shoulder pain.[5] Her strength and external ROM were observed to be slightly decreased. Exhibit 2 at 21. Petitioner's PCP scheduled an MRI for the next day. *Id.* at 20.

On March 4, 2016, Petitioner visited an orthopedist to discuss her MRI results and left shoulder injury. Exhibit 6 at 9-11. She described the severity of her symptoms as moderate and again exhibited good strength and mild limitation in her ROM. *Id.* at 9-10. Petitioner's orthopedist indicated that the MRI had revealed tendinosis, degenerative changes, and defects suggestive of synovial chondromatosis.[6] Exhibit 6 at 11; *see* Exhibit 5 at 8-9 (MRI results). He administered a cortisone injection. Exhibit 6 at 10.

When Petitioner returned approximately six weeks later, she reported improvement following the cortisone injection. Exhibit 6 at 15. She described only "some mild discomfort periodically with quick reaching movements and overhead activity." *Id.* Petitioner "[r]ate[d] her pain as mild in intensity." *Id.*

Despite multiple visits to her PCP from April 2016 through March 2018 for treatment of her chronic back pain and other illnesses, Petitioner did not seek treatment for or report symptoms of her left shoulder injury again until October 2018. *See* Exhibit 2 at 4-19. At this October 3, 2018 visit, Petitioner complained of a lump over her left eye and deep pain in her shoulder. Exhibit 2 at 2. She reported that the injection she received had provided only temporary relief. Petitioner's PCP assessed her as having chronic left shoulder pain and treated the lump over her eye, cleaning it and prescribing medication and ointment. He did not prescribe any treatment for her left shoulder pain, such as pain medication or PT. *Id.* All prescriptions were to treat the lump over Petitioner's eye and sleepiness.[7]

---

[5] Although Petitioner regularly visited her chiropractor throughout 2015-16, the chiropractic records described treatment only for her back, thoracic, and neck pain. Exhibit 10 at 2-56. Only one record provides any indication that Petitioner was experiencing left shoulder pain during this time. On a diagram of the human body depicting Petitioner's back pain from a visit on November 13, 2015, the markings showing the areas of Petitioner's pain appear to cover her left shoulder and upper portion of her arm. *Id.* at 10. Diagrams from subsequent visits on November 14, 2015 and March 3, 2016 indicate pain only on Petitioner's back, and in one instance down her left leg. *Id.* at 12, 14.

[6] Synovial chondromatosis is a type of non-cancerous tumor that arises in the lining of a joint. https://rarediseases.info.nih.gov/diseases/6054/synovial-chondromatosis (last visited on Jan. 21, 2021).

[7] Exhibit 2 at 2 (prescribing Nuvigil and Kelfex). Nuvigil is used to "reduce [] extreme sleepiness." https://www.webmd.com/drugs/2/drug-152275/nuvigil-oral/details (last visited on Jan. 21, 2021). Keflex is medication "used to treat a wide variety of bacterial infections." https://www.webmd.com/drugs/2/drug-6859/keflex-oral/details (last visited on Jan. 21, 2021).

While she did not seek treatment for her left SIRVA from late April 2016 until October 2018, Petitioner reported ongoing left shoulder pain when declining her annual flu vaccine in 2016, 2017, and 2018. Exhibit 4 at 9-11.

### III.     Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[8] *Hodges v. Sec'y of*

---

[8] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

*Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merrow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Judge Merrow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579, 590 (2013). Instead, Judge Merrow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. Id. at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

## IV.     Prior SIRVA Compensation Within SPU[9]

### A.     Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2021, 1,874 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 1,820 of these cases, with the remaining 54 cases dismissed.

Of the compensated cases, 1,058 SPU SIRVA cases involved a prior ruling that petitioner was entitled to compensation. In only 47 of these cases was the amount of damages determined by a special master in a reasoned decision. As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[10]

---

[9] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[10] *See, e.g., Sakovits v. Sec'y of Health & Human Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

1,011 of this subset of post-entitlement determination, compensation-awarding cases were the product of informal settlement - 987 cases via proffer and 24 cases via stipulation. Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by Respondent that the settlement sum itself is a fair measure of damages. Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or in sight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Human Servs.,* No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (emphasis in original).

The remaining 762 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Due to the complexity of these settlement discussions, many which involve multiple competing factors, these awards do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | Damages Decisions by Special Master | Proffered[11] Damages | Stipulated Damages | Stipulated[12] Agreement |
|---|---|---|---|---|
| **Total Cases** | 47 | 987 | 24 | 762 |
| **Lowest** | $55,619.60 | $25,000.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $75,044.44 | $74,040.17 | $90,000.00 | $47,500.00 |
| **Median** | **$86,784.56** | **$93,975.95** | **$115,214.49** | **$65,000.00** |
| **3rd Quartile** | $125,000.00 | $120,390.74 | $153,788.29 | $91,250.53 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $509,552.31 |

---

[11] One award was for an annuity only, the exact amount which was not determined at the time of judgment.

[12] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

### B. Pain and Suffering Awards in Reasoned Decisions

In the 47 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $55,000.00 to $185,000.00, with $85,000.00 the median amount. Only four of these cases involved an award for future pain and suffering, with yearly awards range from $500.00 to $1,000.00.[13]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment of 40 days to over six months. In cases with more significant initial pain, petitioners experienced this greater pain for three months or less. All petitioners displayed only mild to moderate limitations in ROM, and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. These SIRVAs usually resolved after one to two cortisone injections and two months or less of PT. None required surgery. The duration of the injury ranged from six to 29 months, with petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 50 PT sessions over a duration of more than two years and multiple cortisone injections, was required in these cases. In three cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering. In the fourth case involving an award of future pain and suffering, the petitioner provided evidence of an ongoing SIRVA expected to resolve within the subsequent year.

### V. The Parties' Arguments

The parties in this case agreed that Ms. Johnson should be awarded $693.81 for her past lost wages and $1,729.14 for her unreimbursed out-of-pocket expenses. Pet. Brief at 11 n.3, 12 n.4; Res. Brief at 19. Thus, the only area of disagreement is regarding the amount of compensation which should be awarded for Petitioner's past pain and

---

[13] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

suffering.

Petitioner requested $80,000.00 for her past pain and suffering. Pet. Brief at 17. Emphasizing the two-day period between vaccination on October 10, 2015, and the date she sought treatment for her SIRVA (October 12, 2015) (*id.* at 12), Petitioner asserted her pain was "immediate and intense" (*id.* at 13). She maintained that she experienced this intense level of pain, which interfered with her daily activities, during the six months following vaccination. *Id.* at 14. Regarding the overall duration of her SIRVA, Petitioner alleged she suffered "persistent pain and limited range of motion, which impacted care for her back pain," for five years. *Id.* at 15. Based on this description of the intensity and duration of her symptoms, Petitioner argued her symptoms were comparable to those described in nine reasoned decisions in which the petitioners received awards ranging from $75,000.00 to $85,000.00 for their past pain and suffering. *Id.* at 15-17.

In reaction, Respondent maintained Petitioner should be awarded only $57,500.00 for her past pain and suffering. Res. Brief at 1, 19. Describing two additional non-surgical cases in which petitioners were awarded $67,000.00 for their past pain and suffering, Respondent argued the severity and duration of Petitioner's symptoms were less than those suffered by these two petitioners and the petitioners in the nine cases discussed in Petitioner's brief. *Id.* at 17-18. Respondent also spent greater than 50 percent of his brief discussing the following topics: 1) the Vaccine Act's $250,000.00 cap on awards for pain and suffering, 2) the large number of proffered awards in SPU cases, 3) awards for shoulder injuries in the traditional tort system which appear to be substantially lower, and 4) a "meeting-in-the-middle" method that Respondent believes is being utilized by the special masters when determining the appropriate amount of damages to be awarded. *Id.* at 5-16; Appendix A to Res. Brief (list of traditional tort system cases); *see* Section 15(a)(4) ($250,000 statutory cap).

### VI.  Appropriate Compensation for Petitioner's Pain and Suffering

#### A.  General Guidance for Analysis

The guidance provided by the *Graves* decision is clear,[14] and I have previously addressed the more general arguments made by Respondent during expedited motions days and in other damages decisions. While noting that this end result may occur in some cases (and disappoint both sides as a result), I have in fact rejected the "meeting-in-the-middle" method Respondent claims is being used, based on the proposition that "each petitioner deserves an examination of the specific facts and circumstances in her or his case." *Sakovits*, 2020 WL 3729420, at *3. I also have rejected Respondent's argument that the amounts awarded in proffered cases are a more accurate gauge of the

---

[14] *See supra* Section III (for further discussion).

appropriate amount to be awarded than reasoned decisions from the court and special masters. *Id.* at *4. While "settled cases and proffers provide *some* evidence of the kinds of awards received overall in comparable cases," they are not as persuasive as reasoned decisions from a judicial neutral. *Id.* (emphasis in original). Taken as a whole, however, the data from these decisions can be a helpful gauge of the compensation being awarded in SPU SIRVA cases.

I also have not previously given great weight to Respondent's citation to pain and suffering determinations from traditional tort system state court cases, noting that Congress intended the "no-fault" system established in the Vaccine Program to be generous. H.R. REP. NO. 99-908, at 12-13 *reprinted in* 1986 U.S.C.C.A.N. 6344, 6353-54. Thus, Vaccine Program compensation will likely be greater than those awarded in civil actions. Additionally, the descriptions of the traditional tort system cases proposed by Respondent often lack basic information needed for comparison. *Rafferty v. Sec'y of Health & Human Servs.*, No. 17-1906V, 2020 WL 3495956, at *18 (Fed. Cl. Spec. Mstr. May 21, 2020). As a result, "SIRVA awards in the Vaccine Program are self-evidently more relevant and apposite." *Id.*

### B.    Specific Analysis

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing the analysis in this case, I review the record as a whole to include the medical records and affidavits filed and all assertions made by the parties in written documents. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

Although the medical records support Petitioner's claim of significant and immediate pain upon vaccination, they describe a more moderate SIRVA injury than that asserted by Petitioner. The records from six months following vaccination show Petitioner's pain levels decreased after taking oral steroids and engaging in six PT sessions. She consistently exhibited normal strength, and the reduction in ROM was never significant. After receiving a cortisone injection less than five months after vaccination, Petitioner's pain decreased further. By six months after vaccination, Petitioner reported only minor discomfort with certain movements.

For the 30-month period thereafter, from late April 2016 until October 2018, Petitioner did not seek treatment for the left shoulder pain she maintained she was

experiencing. Despite seeking care for other conditions, such as her back, thoracic, and neck pain, she mentioned her left shoulder pain only three times, when declining the flu vaccine. While this lack of treatment does not mean Petitioner's left shoulder injury was fully resolved, it does indicate her pain was not significant enough to cause her to seek further treatment. Additionally, it is important to note that the date Petitioner returned to her PCP for treatment (October 3, 2018) was one week *after* she filed her vaccine petition. Petitioner's claim of persistent pain and limited ROM for the five years after vaccination[15] is not supported by the information contained in her medical records.

An additional factor to consider when determining the appropriate amount of compensation for Petitioner's pain and suffering is the chronic back, thoracic, and neck pain she suffered both prior to and during her SIRVA injury. Petitioner argues that her SIRVA injury impacted the treatment of this pain,[16] but the chiropractic records do not support this assertion. Furthermore, it is clear that some of the difficulties Petitioner describes, such as her problems sleeping, can at least partially be attributed to this other unrelated source of pain.

Overall, I find that the events and circumstances surrounding Petitioner's SIRVA injury more closely resemble those of the petitioners in the two cases cited by Respondent, *George* and *Bartholomew,* than in the cases cited by Petitioner.[17] One of the latter petitioners, for example, was awarded $80,000.00 (the amount requested herein) for past pain and suffering, but experienced initial severe pain for a longer period than the Petitioner in this case (six months as opposed to less than two months). *Kent v. Sec'y of Health & Human Servs.*, No. 17-0073V, 2019 WL 5579493, at *12 (Fed. Cl. Spec. Mstr. Aug. 7, 2019). Additionally, the *Kent* petitioner's ROM was severely to moderately limited, a more significant reduction than the mild limitation experienced by Petitioner, who required much fewer PT sessions. *Id.* at *12-13.

After examining all the most relevant reasoned decisions in SPU SIRVA cases, I have concluded the severity and duration of Petitioner's SIRVA most closely resembles that experienced by the petitioner in *Kuhn,* who was awarded $67,500.00. *Kuhn v. Sec'y of Health & Human Servs.*, No. 18-0091V, 2020 WL 3750994 (Fed. Cl. Spec. Mstr. June 5, 2020). Both petitioners suffered severe pain initially but only mild limitations in ROM, sought treatment soon after vaccination, and received relief within a few months after one cortisone injection and only a month of PT. *Id.* at *2.

---

[15] Pet. Brief at 15; Exhibit 15 at ¶ 13 (Petitioner's affidavit).

[16] Pet. Brief at 9-10 (citing Petitioner's affidavit, Exhibit 15 at ¶ 15).

[17] *George v. Sec'y of Health & Human Servs.*, No. 18-0426V, 2020 WL 4692451 (Fed. Cl. Spec. Mstr. July 10, 2020); *Bartholomew v. Sec'y of Health & Human Servs.,* No. 18-1570V, 2020 WL 3639805 (Fed. Cl. Spec. Mstr. June 5, 2020).

There is one difference, however, which dictates that Petitioner should receive a lower award than the *Kuhn* petitioner. Like the petitioner in *Murray,* who received an award of $65,000.00, Ms. Johnson also had an unrelated condition which constituted an additional source of pain. *Murray v. Sec'y of Health & Human Servs.*, No. 18-0534V, 2020 WL 4522483, at *4 (Fed. Cl. Spec. Mstr. July 6, 2020). Petitioner otherwise has not established that the persistent and/or ongoing nature of her pain or injury warrant a future component for pain and suffering, beyond the sum I am allowing for past pain and suffering.

## VII. Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $65,000.00 represents a fair and appropriate amount of compensation for Petitioner's past/actual pain and suffering. I also find that Petitioner is entitled to $693.81 for her past lost wages, and $1,729.14 for her unreimbursed out-of-pocket expenses.**

**I thus award Petitioner a lump sum payment of $67,422.95, representing $65,000.00 for her past/actual pain and suffering, $693.81 for her actual lost earnings, and $1,729.14 for her actual unreimbursable expenses in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this decision.[18]

**IT IS SO ORDERED.**

s/Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

---

[18] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.